NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

18-273

STATE OF LOUISIANA

VERSUS

JARED PAUL PONTIFF

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. 627-13
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

JUDGE
VAN H. KYZAR

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John E. Conery, and Van H. Kyzar, Judges.

WRIT DENIED.

**Jared Paul Pontiff**
**Hunt Correctional Center**
**P. O. Box 174**
**St. Gabriel, LA 70776**
**In Proper Person**

**Michael C. Cassidy**
**District Attorney**
**Thirty-First Judicial District**
**P. O. Box 1388**
**Jennings, LA 70546**
**(337) 824-1893**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**KYZAR, Judge.**

Relator, Jared Paul Pontiff, seeks review of the trial court's denial of his post-conviction relief application. For the reasons set forth herein, we deny the Relator's writ application.

## FACTS AND PROCEDURAL HISTORY

On January 27, 2014, Relator was convicted of one count of sexual battery of an eight-year-old child and sentenced to thirty years at hard labor, with twenty-five years to be served without the benefit of probation, parole, or suspension of sentence. Relator's conviction and sentence were affirmed by this court on May 6, 2015, and Relator's writ application to the supreme court was denied on October 28, 2016. *State v. Pontiff*, 14-1049 (La.App. 3 Cir. 5/6/15), 166 So.3d 1120, *writ denied*, 15-1107 (La. 10/28/16), 209 So.3d 94.

Relator filed a post-conviction relief application in the trial court, which was dismissed on February 15, 2018. On April 5, 2018, Relator filed the current writ application in which he states that on September 27, 2017, he petitioned the trial court for a copy of his trial transcript in order to file his post-conviction relief application. According to Relator, the trial court granted Relator's request as to court minutes but denied his request as to the trial transcript. Relator sought review by filing a writ application in this court. On July 24, 2018, this court denied Relator's request for a copy of his trial transcript, stating the following:

> **WRIT DENIED:** Relator filed a writ application with this court seeking review of the trial court's September 27, 2017 "ORDER GRANTING PRODUCTION IN PART AND DENYING IN PART." Relator is asking this court to order the trial court to provide him with a copy of the transcript of his trial proceedings. The requested document is not one Relator is entitled to free of charge. . Because Relator does not allege that he made a showing of particularized need by properly filing an application for post-conviction relief with the trial court establishing a need to obtain the document, he is not entitled to a free copy of the requested document. *State ex rel. Bernard v. Criminal*

*Dist. Ct.' Section "J.",* 94-2247 (La. 4/28/95), 653 So.2d 1 174. Accordingly, Relator's writ application is denied.

*State v. Pontiff,* 17-976 (La.App. 3 Cir. 7/24/18) (unpublished opinion).

In Relator's current writ application, he relies upon the court minutes to set forth his assignments of error and reserved his right to file a supplemental writ application once he received the trial transcript. No supplemental writ application was submitted regarding Relator's need for the transcript.

## DISCUSSION

In his writ application, Relator argues three allegations of error in his trial that he claims entitle him to relief. First, he asserts that the trial court erred in partially closing the courtroom during the testimony of the minor victims of his alleged crimes, and alternatively, if this court deems the error waived in the absence of an objection by his counsel to the closure, that such amounts to ineffective assistance of counsel. He next asserts that the trial court erred in refusing to revisit the issue raised on direct appeal wherein Relator challenged the trial court's denial of his right to subpoena and question a juror post-verdict about her omission of relevant information during voir dire, the trial court's denial of his right to subpoena and question other jurors concerning the improprieties of the juror during deliberations, and the trial court's denial of Relator's motion for new trial based on these allegations.

### *Partial Courtroom Closure*

Relator first argues that the trial court erred in partially closing the courtroom without a hearing and without stating the reasons for the closure. Relator argues that the denial of the right to a public trial is a structural due process claim, citing *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246 (1991). In *Fulminante,* the Supreme Court cited *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210 (1984), for the

2

proposition that the right to a public trial is a constitutional error not subject to the harmless error analysis. In *Waller*, the Supreme Court acknowledged that specific prejudice need not be shown for such a violation.

In his second assignment of error, Relator acknowledges that his counsel did not object to the partial closure of the courtroom, but argues, in the alternative, that his counsel was ineffective for failing to object. Relator argues that if his claim was waived by his counsel's failure to object to the closure of the courtroom, then his counsel was ineffective in failing to object and in preserving his right to a public trial. *See State v. Arisme*, 13-269 (La.App. 3 Cir. 10/9/13), 123 So.3d 1259; Uniform Rules—Courts of Appeal, Rule 1-3.

We first address Relator's claim that the partial closure of the courtroom for the minors' testimony is a structural error, thus, calling for a reversal of the conviction regardless of a showing of actual prejudice, or whether it should be treated as a non-preserved error that must be relegated to an ineffective assistance of counsel claim.

In *Weaver v. Massachusetts*, _ U.S. _, 137 S.Ct. 1899 (2017), the Supreme Court recognized that in a direct review context, a courtroom closure has been treated as a structural error, entitling a defendant to automatic reversal without any inquiry into prejudice. The question before the Court in *Weaver* was whether the "prejudice inquiry is altered when the structural error is raised in the context of an ineffective-assistance-of-counsel claim." *Weaver*, 137 S.Ct. at 1905. The Court stated:

> So although the public-trial right is structural, it is subject to exceptions. See Simonson, The Criminal Court Audience in a Post-Trial World, 127 Harv. L. Rev. 2173, 2219-2222 (2014) (discussing situations in which a trial court may order a courtroom closure). Though these cases should be rare, a judge may deprive a defendant of his right to an open courtroom by making proper factual findings in support of the decision to do so. See *Waller, supra*, at 45, 104 S.Ct.

3

2210. The fact that the public-trial right is subject to these exceptions suggests that not every public-trial violation results in fundamental unfairness.

A public-trial violation can occur, moreover, as it did in *Presley* [*v. Georgia*, 558 U.S. 209, 130 S.Ct. 721 (2010)], simply because the trial court omits to make the proper findings before closing the courtroom, even if those findings might have been fully supported by the evidence. See 558 U.S., at 215, 130 S.Ct. 721. It would be unconvincing to deem a trial fundamentally unfair just because a judge omitted to announce factual findings before making an otherwise valid decision to order the courtroom temporarily closed. As a result, it would be likewise unconvincing if the Court had said that a public-trial violation always leads to a fundamentally unfair trial.

Indeed, the Court has not said that a public-trial violation renders a trial fundamentally unfair in every case. In the two cases in which the Court has discussed the reasons for classifying a public-trial violation as structural error, the Court has said that a public-trial violation is structural for a different reason: because of the "difficulty of assessing the effect of the error." *Gonzalez-Lopez*, 548 U.S., at 149, n. 4, 126 S.Ct. 2557; see also *Waller, supra*, at 49, n. 9, 104 S.Ct. 2210.

The public-trial right also protects some interests that do not belong to the defendant. After all, the right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused. See, *e.g., Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501, 508-510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572-573, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). So one other factor leading to the classification of structural error is that the public trial right furthers interests other than protecting the defendant against unjust conviction. These precepts confirm the conclusion the Court now reaches that, while the public-trial right is important for fundamental reasons, in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint.

The Court now turns to the proper remedy for addressing the violation of a structural right, and in particular the right to a public trial. Despite its name, the term "structural error" carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was "harmless beyond a reasonable doubt." *Chapman* [*v. California*], 386 U.S. [18], at 24, 87 S.Ct. 824 [967)]. Thus, in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to "automatic reversal" regardless of the error's actual "effect on the outcome." *Neder v. United States*, 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

4

The question then becomes what showing is necessary when the defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective-assistance-of-counsel claim. To obtain relief on the basis of ineffective assistance of counsel, the defendant as a general rule bears the burden to meet two standards. First, the defendant must show deficient performance—that the attorney's error was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, the defendant must show that the attorney's error "prejudiced the defense." *Ibid.*

The prejudice showing is in most cases a necessary part of a *Strickland* claim. The reason is that a defendant has a right to effective representation, not a right to an attorney who performs his duties "mistake-free." *Gonzalez-Lopez*, 548 U.S., at 147, 126 S.Ct. 2557. As a rule, therefore, a "violation of the Sixth Amendment right to effective representation is not 'complete' until the defendant is prejudiced." *Ibid.* (emphasis deleted); see also *Premo v. Moore*, 562 U.S. 115, 128, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011); *Lockhart v. Fretwell*, 506 U.S. 364, 370, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

That said, the concept of prejudice is defined in different ways depending on the context in which it appears. In the ordinary *Strickland* case, prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [*Strickland*,] 466 U.S., at 694, 104 S.Ct. 2052. But the *Strickland* Court cautioned that the prejudice inquiry is not meant to be applied in a "mechanical" fashion. *Id.*, at 696, 104 S.Ct. 2052. For when a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on "the fundamental fairness of the proceeding." *Ibid.* Petitioner therefore argues that under a proper interpretation of *Strickland*, even if there is no showing of a reasonable probability of a different outcome, relief still must be granted if the convicted person shows that attorney errors rendered the trial fundamentally unfair. For the analytical purposes of this case, the Court will assume that petitioner's interpretation of *Strickland* is the correct one. In light of the Court's ultimate holding, however, the Court need not decide that question here.

As explained above, not every public-trial violation will in fact lead to a fundamentally unfair trial. See *supra*, at 1910. Nor can it be said that the failure to object to a public-trial violation always deprives the defendant of a reasonable probability of a different outcome. Thus, when a defendant raises a public-trial violation via an ineffective assistance-of-counsel claim, *Strickland* prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or, as the Court has assumed for these purposes, see *supra*, at 1910 - 1911, to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.

5

. . . .

The reason for placing the burden on the petitioner in this case, however, derives both from the nature of the error, see supra, at 1910 - 1912, and the difference between a public-trial violation preserved and then raised on direct review and a public-trial violation raised as an ineffective-assistance-of-counsel claim. As explained above, when a defendant objects to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed. See *supra*, at 1909 - 1910. When a defendant first raises the closure in an ineffective-assistance claim, however, the trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure.

Furthermore, when state or federal courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent. That is because, if a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost. There are also advantages of direct judicial supervision. Reviewing courts, in the regular course of the appellate process, can give instruction to the trial courts in a familiar context that allows for elaboration of the relevant principles based on review of an adequate record. For instance, in this case, the factors and circumstances that might justify a temporary closure are best considered in the regular appellate process and not in the context of a later proceeding, with its added time delays.

When an ineffective-assistance-of-counsel claim is raised in postconviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases. The finality interest is more at risk, see *Strickland*, 466 U.S., at 693-694, 104 S.Ct. 2052 (noting the "profound importance of finality in criminal proceedings"), and direct review often has given at least one opportunity for an appellate review of trial proceedings. These differences justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised instead in a claim alleging ineffective assistance of counsel.

*Id.* at 1909-12.

In light of this rationale, we consider that Relator is confined to a review of his claim only as an ineffective assistance of counsel claim even though the error may have been considered a structural error if raised in the first instance.

In its ruling on Relator's writ application, the trial court stated the following regarding Relator's claim of ineffective assistance of counsel:

6

Finally, PONTIFF contends that the courtroom should not have been closed and that his attorney should have objected to the closure. The only time the courtroom was closed during the trial was during the testimony of the two (2) minor victims. It is this Court's custom to close the courtroom when underage victims are testifying. Under *Strickland v. Washington*, [466 U.S. 668, 104 S.Ct. 2052 (1984)], a defendant must show that his counsel's performance was deficient (errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment) and that the deficient performance prejudiced the defense, such that, the defendant was deprived of a fair trial. After reviewing the record, the Court finds that there was no error to closing the courtroom during the minor victims['] testimony. In addition, Mr. Oustalet's performance at trial was excellent. He filed several pre-trial motions on behalf of the defendant and called several witnesses to support his case. Mr. Oustalet also filed Motions for Acquittal and for New Trial after the trial resulted in a conviction. PONTIFF was acquitted on one of the charges he was facing as well. As a result, the Court cannot find that Mr. Oustalet was deficient in any way in his representation of the defendant or that PONTIFF's defense was prejudiced in any way by Mr. Oustalet's actions.

Relator asserts that the *Strickland* standard should not be used. Rather, Relator asserts that this court should find that he was denied counsel at a "critical stage" of trial, making the error presumptively prejudicial. Defendant cites *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984), which discussed situations where a defendant was effectively denied the assistance of counsel and prejudice was presumed. The facts of the present case do not warrant such a finding. To determine whether counsel here acted deficiently in failing to object, it is necessary to determine whether an objection was necessary, i.e., whether there was reason to object to the trial court's closure of the courtroom in this case. This court, in *State v. Loyden*, 04-1558, pp. 18-19 (La.App. 3 Cir. 4/6/05), 899 So.2d 166, 178-79 (second alteration ours), rejected the defendant's argument that the trial court's partial closure of the courtroom for the testimony of minor victims violated his right to a public trial:

In a criminal case, the accused is afforded the right to enjoy a public trial by both the United States Constitution and the Louisiana Constitution. U.S. Const. amend. VI; La. Const. art. I, 16. "However,

7

this right to a public trial is not absolute, and it may give way to other rights or interests[.]" *State v. Sarrio*, 01-543, p. 10 (La.App. 5 Cir. 11/27/01), 803 So.2d 212, 219, *writ denied*, 02-0358 (La.2/7/03), 836 So.2d 86.

In *State v. Raymond*, 447 So.2d 51, 53 (La.App. 1 Cir.), *writ denied*, 449 So.2d 1347 (La. 1984), the trial court cleared the courtroom of two non-witness adult children of the wife of the defendant who was testifying about her husband's sexual abuse of children. The first circuit held:

> In criminal cases, the accused is granted the right to enjoy a public trial. U.S. Const.Amend. 6 and 14; La. Const. Art. 1, sec. 16 (1974). The right to a public trial is not a "limitless imperative"; the right is subject to the trial judge's power to keep order in the courtroom, or to prevent unnecessary pressures or embarrassment to a witness. *United States ex rel. Smallwood v. La Valle*, 377 F.Supp. 1148 (E.D.N.Y.1974), aff'd 508 F.2d 837 (1974); cert. denied[,] 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975). A trial judge may, in his sound discretion, exclude spectators from the courtroom while the testimony of a witness in a criminal case is being taken, if such a step is reasonably necessary to prevent embarrassment or emotional disturbance of that witness or to enable that witness to testify to facts material to the case. *State v. Poindexter*, 231 La. 630, 92 So.2d 390 (1956).

*Id.* at 53.

Louisiana Revised Statutes 15:469.1, in pertinent part, provides that "[i]n cases of . . . aggravated rape . in which the victim is a child of fifteen years of age or younger, the trial court . . . may order that the testimony of such victim be heard either in closed session of court or in the judge's chambers[.]"

In the present case, prior to the testimony of the minor victims who were seven and eight years old at the time of trial, the trial court cleared the courtroom of anyone other than reporters, social workers, and anyone else who may have been "exempt[ed.]" We find that the trial court did not violate the defendant's constitutional right to a public trial since he did not exclude the media and other essential parties. Our review of the record indicates that the trial court sought to create an atmosphere where the two minor children could testify about their experiences with a minimum amount of embarrassment, in order to facilitate more accurate testimony.

We also note that, according to the record, at the time of the partial-closure of the courtroom, the defendant did not object to the courtroom being cleared of nonessential people, thereby waiving the right to raise the issue on appeal. La.Code Crim.P. art. 841.

In *State v. Canales*, 16-272, pp. 9-11 (La.App. 5 Cir. 12/7/16), 206 So.3d 458,

463-65, *writ denied*, 17-46 (La. 9/22/17), 227 So.3d 824 (footnote omitted) (first and

last alteration in original), the case cited by Relator in his writ application, the fifth

circuit addressed the issue as follows:

> We next consider the issue of whether the trial court's action in removing the spectators during A.V.'s testimony resulted in an infrigement [sic] of defendant's constitutional right to a public trial.
>
> As provided in the sixth amendment of the United States Constitution, and Article 1, section 16, of the Louisiana Constitution, in a criminal case, the accused is afforded the right to enjoy a public trial. However, the right to a public trial is not absolute. *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The right to a public trial is not a "limitless imperative[,]" the right is subject to the trial judge's power to keep order in the courtroom or to prevent unnecessary pressures or embarrassment to a witness. *United States ex rel. Smallwood v. Lavalle*, [377 F.Supp. 1148 (E.D.N.Y.), *affirmed*, 508 F.2d 837 (2nd Cir. 1974), *cert. denied*, 421 U.S. 920, 95 S.Ct. 1586 (1975)]. A trial judge may, in his sound discretion, exclude spectators from the courtroom while the testimony of a witness in a criminal case is being taken, if such a step is reasonably necessary to prevent embarrassment or emotional disturbance of that witness or to enable that witness to testify to facts material to the case. *State v. Poindexter*, [231 La. 630, 92 So.2d 390 (1956)].
>
> Defendant urges this Court to apply the factors found in *Waller v. Georgia*, *supra*, to determine the propriety of the trial court's action in removing some of the spectators from the courtroom during A.V.'s testimony. *Waller*, however, dealt with a different set of circumstances.
>
> We find that the U.S. Fifth Circuit's opinion in *United States v. Osborne*, [68 F.3d 94 (5th Cir. 1995)], provides a more relevant framework for analyzing this issue with respect to a partial closure of the proceedings. In *Osborne*, the U.S. Fifth Circuit Court of Appeal recognized that other circuit courts had adopted a modified version of *Waller*, which was "a less demanding test requiring the party seeking the partial closure to show only a 'substantial reason' for the closure."
>
> > Prior to the *Waller* decision, this circuit addressed the constitutionality of a partial closure in *Aaron v. Capps* [507 F.2d 684 (5th Cir. 1975), *cert. denied*, 423 U.S. 878, 96 S.Ct. 153 (1975)]. In *Aaron*, this court held that, when considering a partial closure, a trial court should look to the particular circumstances of the case to see if the defendant will still receive the safeguards of the public trial guarantee. This court reasoned that the partial closing of court proceedings does not raise the same constitutional

9

concerns as a total closure, because an audience remains to ensure the fairness of the proceedings.

Although this circuit has not had the opportunity to reexamine the constitutionality of a partial closing since the *Waller* decision, five other circuits have addressed the issue. The Second, Eighth, Ninth, Tenth, and Eleventh Circuits have all found that *Waller's* stringent standard does not apply to partial closures, and have adopted a less demanding test requiring the party seeking the partial closure to show only a "substantial reason" for the closure. As in this circuit's *Aaron* decision, these courts have all based their decisions on a determination that partial closures do not implicate the same fairness and secrecy concerns as total closures.

We agree. We do not read *Waller* as altering this court's analysis of partial closings as discussed in *Aaron*. We now, however, also adopt the "substantial reason" test set forth by other courts as a method of determining if a partial closure meets the constitutional standards of *Aaron*.

Applying this test to the instant suit, we find that the partial closure was justified.

*Id.* at 98-99.

In the instant case, the State made the trial court aware of A.V.'s concerns that she would have great difficulty testifying if the defendant's family members were present. As discussed *supra*, we find that the State's argument on this point, without any additional evidence in the record, was sufficient for the court to consider a partial closure of the trial for A.V.'s testimony. The only remaining question, then, is whether the State's argument regarding A.V.'s reluctance to testify provided a substantial reason to the court to justify a partial closure.

In granting the partial closure, the trial judge explained her ruling, in part:

THE COURT:

. . . .

As far as I'm concerned, individuals in the back really, in the gallery area, the family members have – don't have constitutional rights. He has to be here the whole time but it's not necessary that they be here the entire time. And if she's uncomfortable with them in the courtroom while she testify, [sic] and we want the truth, and we want her to testify truthfully, fully and truthfully, then I have to,

10

at least within reason making sure his constitutional rights are protected, afford her the opportunity to do just that.

As the reviewing courts did in the cases discussed *supra*, we find the trial court's action of excluding certain persons from the courtroom for the limited duration of A.V.'s testimony to be adequately supported. The Louisiana Supreme Court has acknowledged that a trial judge has the discretion to exclude persons from the courtroom if he or she deems it to be reasonably necessary to prevent embarrassment or emotional disturbance of that witness or to enable that witness to testify to facts material to the case. *State v. Poindexter, supra*. In this case, the trial court made a finding on the record that removing the relevant spectators from the courtroom would assist the victim in testifying. As the court did in *United States v. Osborne*, we infer that the trial court took such action to help alleviate any impact that A.V. believed her testifying in the presence of defendant's family would have upon her emotional state. The trial court also took care to have the defendant's family leave from and return to the courtroom outside of the presence of the jury. Furthermore, the courtroom remained open to the general public during the portion of the trial when A.V. testified. Defendant has not alleged any prejudice resulting from the partial closure.

Based upon our review of the record, we cannot say that the trial judge's accommodations in this case to allow A.V. to testify with minimum embarrassment or emotional disturbance was an error that violated defendant's constitutional right to a public trial. This assignment is without merit.

In the present case, it appears the courtroom was closed on more than one occasion. The first time was at the request of the State:

MS. NAQUIN:

I do have one quick request. Based on the CAC video aiming to protect the child, I would ask that the courtroom be cleared of anybody that's not necessary to the trial.

THE COURT:

All right. The court- the courtroom will be cleared because it's dealing with minors. Unless you are officers of the courtroom, you have to step out of the courtroom, all right.

During the testimony of one of the victims, the trial court cleared the courtroom of everyone except officers of the court and the victim's guardian. The record is unclear as to who was considered an "officer of the court" and allowed to stay in the courtroom. It is also not clear as to whether the media and other "essential

11

parties" such as social workers were exempt from the closure as they were in *Loyden*.

Thus, the instant case is distinguishable from both *Loyden* and *Canales*, since there was no specific discussion as to whether a closed courtroom was necessary for the minor victims to feel comfortable testifying or that such was necessary for their protection. However, the trial court did specifically state that it was clearing the courtroom because of the minors testifying. As such, while we are unable, on this record, to answer with any clarity the question of whether Relator's counsel acted deficiently in failing to object in this particular case, that deficiency does not end our inquiry.

Even assuming *arguendo* that the conduct rose to the level of ineffective assistance of counsel, we must next turn to the second prong of the two-part query of *Strickland*, i.e., whether Relator has proven actual prejudice in that there was a reasonable probability of a different outcome but for counsel's failure to object or that counsel's failure to object led to a fundamentally unfair trial. In *Weaver*, 137 S.Ct. at 1913, the Supreme Court addressed these questions as follows:

> In light of the above assumption that prejudice can be shown by a demonstration of fundamental unfairness, see *supra*, at 1910 - 1911, the remaining question is whether petitioner has shown that counsel's failure to object rendered the trial fundamentally unfair. See *Strickland*, *supra*, at 696, 104 S.Ct. 2052[.] The Court concludes that petitioner has not made the showing. Although petitioner's mother and her minister were indeed excluded from the courtroom for two days during jury selection, petitioner's trial was not conducted in secret or in a remote place. Cf. *In re Oliver*, 333 U.S. 257, 269, n. 22, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The closure was limited to the jury voir dire; the courtroom remained open during the evidentiary phase of the trial; the closure decision apparently was made by court officers rather than the judge; there were many members of the venire who did not become jurors but who did observe the proceedings; and there was a record made of the proceedings that does not indicate any basis for concern, other than the closure itself.

> There has been no showing, furthermore, that the potential harms flowing from a courtroom closure came to pass in this case. For example, there is no suggestion that any juror lied during voir dire; no suggestion of misbehavior by the prosecutor, judge, or any other party;

12

and no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands. It is true that this case comes here on the assumption that the closure was a Sixth Amendment violation. And it must be recognized that open trials ensure respect for the justice system and allow the press and the public to judge the proceedings that occur in our Nation's courts. Even so, the violation here did not pervade the whole trial or lead to basic unfairness.

In sum, petitioner has not shown a reasonable probability of a different outcome but for counsel's failure to object, and he has not shown that counsel's shortcomings led to a fundamentally unfair trial. He is not entitled to a new trial.

Likewise, we find that even if Relator could prove that his counsel's failure to object constituted deficient performance, he failed to prove that he was actually prejudiced. First, Relator fails to prove that his counsel's objection should have been granted had it been raised. As reflected above, the trial court has the right to protect the minor witnesses and may, on a proper finding, allow limited access to the courtroom during such testimony. In this case, the trial court did specifically note that the witnesses were minors, although giving no other reason for the closure. Further, Relator simply argues that his father and the public were denied access to the courtroom, but makes no direct allegation, much less offers any proof, that either his father or the public would have caused the victims to testify differently. Additionally, Relator makes no allegation that the witnesses lied.

As this court discussed in his direct appeal, Relator was found not guilty of one of the two counts that he faced at trial. Obviously, Relator's counsel adequately represented him as to the count resulting in the not guilty verdict, under the same procedural facts. For these reasons, Relator has not shown a reasonable probability of a different outcome but for counsel's failure to object and has not shown that counsel's failure to object led to a fundamentally unfair trial. Accordingly, we find Relator's assignments of error as to the trial court's decision to close the courtroom during certain testimonies at trial to be without merit.

13

### *Juror Impeachment*

Relator next argues that the trial court erred in refusing to revisit the issue of juror impeachment, which was raised on his direct appeal. In his appeal, Relator challenged the trial court's denial of his right to subpoena and question a juror about her omission of relevant information during voir dire, the trial court's denial of his right to subpoena and question other jurors concerning the improprieties of the juror during deliberations, and the trial court's denial of Relator's motion for new trial based on these allegations. *Pontiff*, 166 So.3d 1120. As this court discussed, Relator filed a motion for new trial, alleging that since the jury's verdict, he had discovered that Juror No. 46 failed to disclose during voir dire that she had been the victim of a sexual assault. *Id.* Relator also learned that Juror No. 46 disclosed the sexual assault to the deliberating jury and broke down emotionally during deliberations. *Id.* Relator issued subpoenas for four of the jurors to appear at the motion for new trial, but the trial court granted the State's motion to quash the subpoenas, relying upon the "Jury Shield Law" as its authority. *Id.* Although this court agreed with Relator that the "Jury Shield Law" did not prohibit Relator from questioning Juror No. 46 as to whether she was truthful during voir dire, this court found that Juror No. 46's statements during voir dire were not untruthful. *Id* . Accordingly, this court found that the trial court did not err in quashing the subpoena of Juror No. 46, as far as it alleged misconduct during voir dire. *Id.*

This court further addressed the issue as follows:

> We find that any error that occurred because of Juror No. 46's failure to disclose a prior sexual assault during voir dire was harmless. The jury's vote as to count one, oral sexual battery, was not guilty, and the jury's vote as to count two, sexual battery, was guilty by a unanimous vote. Considering the jury's not guilty vote as to count one, Defendant was obviously not prejudiced as to that count. As to count two, the jury's verdict was unanimous even though a vote of only ten out of twelve was required. See La.Code Crim.P. art. 782(A). In *State v. Johnson*, 32,910 (La.App. 2 Cir. 1/26/00), 750 So.2d 398, *writ*

*denied*, 00-91 1 (La. 11/3/00), 773 So.2d 140, the second circuit found that because Johnson was convicted by a unanimous jury when only ten out of twelve votes were required, Johnson could not show that he was prejudiced by the jurors' alleged false statements during voir dire. In the instant matter, we find that Defendant has failed to show that he was prejudiced by failure of Juror No. 46 to relate her experiences to the trial court.

In *State v. Ingram*, 10-2274, pp. 6-8 (La.3/25/11), 57 So.3d 299, 302-03 (citations omitted)(alterations in original), the supreme court discussed the jury shield law as follows:

> As a general rule, "[j]urors are not expected to come into the jury box and leave behind all that their human experience has taught them." Individual jurors "bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." For the most part, how jurors may draw on their experience in the deliberative process remains shielded from view and therefore largely unknowable. Louisiana subscribes to the common law rule, incorporated in La.C.E. art. 606(B), that jurors may not impeach their verdict by evidence of their own misconduct. The rule incorporates important systemic values, including the finality of judgments, and allows only the narrow exceptions for outside influences or extraneous prejudicial information. . . . As the trial court in the present case was keenly aware, jurors generally remain free to share what their experience and knowledge has taught them, even in situations similar to the circumstances of the crime for which they are empaneled, without calling into question the validity of their verdict. *See, e.g., State v. Sanders*, 33,778, pp. 4-5 (La.App.2d Cir. 10/4/00), 769 So.2d 183, 187 (in trial for a drive-by shooting in which the victim lost his spleen, jury foreman remained free to discuss his personal experience as the victim of a drive-by shooting and conveyed information gleaned from his wife, a nurse, about the difficulties of living without a spleen).
>
> However, in exceptional cases, jurors themselves may be the source of extraneous prejudicial outside information as well as third parties. *See, e.g., Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997) ("When a juror communicates objective extrinsic facts regarding the defendant or the alleged crimes to the jurors, the juror becomes an unsworn witness within the meaning of the Confrontation Clause. That the unsworn testimony comes from a juror rather than a court official does not diminish the scope of a defendant's rights under the Sixth Amendment."); *United States v. Swinton*, 75 F.3d 374, 381

15

(8th Cir.1996)("[T]he inquiry is not whether the jurors 'became witnesses' in the sense that they discussed any matters not of record but whether they discussed specific extra-record facts relating to the defendant, and if they did, whether there was a significant possibility that the defendant was prejudiced thereby.") (internal quotation marks and citation omitted).

In [*State v.*] *Austin*, 11-2150, [(La.App. 1 Cir. 6/8/12) (unpublished opinion), *writ denied*, 12-1595 (La. 2/8/13), 108 So.3d 77,] the first circuit faced a factually similar case wherein the jury foreperson allegedly failed to disclose that he had close relationships with two people that were murdered. Like the Defendant in the present case, Austin sought to have the jury foreperson and another juror testify at a motion for new trial hearing as to what they discussed in the jury room. Austin's defense counsel argued that if the foreperson mentioned during deliberations that he was good friends with two people that were murdered, there would be grounds for a new trial. The trial court in *Austin* denied the motion for new trial without allowing the jurors to testify. Affirming the trial court's decision, the first circuit, citing the jury shield law, found that it would have been improper for the two jurors to testify. The first circuit first found that Austin failed to meet the requirement of specificity in alleging juror misconduct. Further, the first circuit found that Austin failed to allege that the jury was prejudiced by any "outside influences" or "extraneous prejudicial information[:]"

> There has been nothing alleged to suggest that the jury based its verdict on prohibited factors, such as coercion by a party or inadmissible evidence of other crimes obtained from an out-of-court source. Moreover, communications among jurors, even when violative of the trial court's instructions, do not amount to "outside influences" or "extraneous prejudicial information" [*State v.*] Emanuel-Dunn, [03-550 (La.App. 1 Cir. 11/7/03),] 868 So.2d [75,] at 82 [*writ denied*, 04-339 (La.6/25/04), 876 So.2d 829]. Because any intra-jury communications that may have taken place were not improper outside influences or extraneous prejudicial information, we find that the trial court properly denied the defendant's motion for new trial. *See* [*State v.*] *Horne*, [28,327 (La.App. 2 Cir. 8/21/96),] 679 So.2d [953,] at 958[, *writ denied*, 96-3245 (La.2/21/97), 688 So.2d 521].

*Id.* at p. 8.

Likewise, the improper communications alleged by Defendant in the present case were not improper outside influences or extraneous prejudicial information. Rather, the alleged communication involved Juror No. 46's own human experience. Thus, we find the trial court

correctly quashed Defendant's subpoena of the jurors as to their deliberations.

*Id.* at 1135-36 (fourth and fifth alteration ours).

In ruling on Relator's writ application, the trial court found that Relator's claim regarding the juror was addressed by this court on appeal, and Relator failed to introduce any evidence or argument that compelled the trial court to revisit the issue. In so concluding, the trial court denied Relator's claim as repetitive.

Louisiana Code of Criminal Procedure Article 930.4 provides, in pertinent part: "Unless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered." Relator asserts his claim regarding Juror No. 46 should be reconsidered "in the interest of justice" in light of the United States Supreme Court's holding in *Peña-Rodriguez v. Colorado*, _ U.S. _, 137 S.Ct. 855 (2017). In *Peña-Rodriguez*, 137 S.Ct. at 861-62 (alteration in original), the Supreme Court addressed whether an exception to the "no impeachment rule" should be recognized in the following situation:

> State prosecutors in Colorado brought criminal charges against petitioner, Miguel Angel Peñia-Rodriguez, based on the following allegations. In 2007, in the bathroom of a Colorado horse-racing facility, a man sexually assaulted two teenage sisters. The girls told their father and identified the man as an employee of the racetrack. The police located and arrested petitioner. Each girl separately identified petitioner as the man who had assaulted her.
>
> The State charged petitioner with harassment, unlawful sexual contact, and attempted sexual assault on a child. Before the jury was empaneled, members of the venire were repeatedly asked whether they believed that they could be fair and impartial in the case. A written questionnaire asked if there was "anything about you that you feel would make it difficult for you to be a fair juror." App. 14. The court repeated the question to the panel of prospective jurors and encouraged jurors to speak in private with the court if they had any concerns about their impartiality. Defense counsel likewise asked whether anyone felt that "this is simply not a good case" for them to be a fair juror. *Id.*, at 34. None of the empaneled jurors expressed any reservations based on racial or any other bias. And none asked to speak with the trial judge.

17

After a 3-day trial, the jury found petitioner guilty of unlawful sexual contact and harassment, but it failed to reach a verdict on the attempted sexual assault charge. When the jury was discharged, the court gave them this instruction, as mandated by Colorado law:

> "The question may arise whether you may now discuss this case with the lawyers, defendant, or other persons. For your guidance the court instructs you that whether you talk to anyone is entirely your own decision. . . . If any person persists in discussing the case over your objection, or becomes critical of your service either before or after any discussion has begun, please report it to me." *Id.*, at 85-86.

Following the discharge of the jury, petitioner's counsel entered the jury room to discuss the trial with the jurors. As the room was emptying, two jurors remained to speak with counsel in private. They stated that, during deliberations, another juror had expressed anti-Hispanic bias toward petitioner and petitioner's alibi witness. Petitioner's counsel reported this to the court and, with the court's supervision, obtained sworn affidavits from the two jurors.

The affidavits by the two jurors described a number of biased statements made by another juror, identified as Juror H.C. According to the two jurors, H.C. told the other jurors that he "believed the defendant was guilty because, in [H.C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." *Id.*, at 110. The jurors reported that H.C. stated his belief that Mexican men are physically controlling of women because of their sense of entitlement, and further stated, 'I think he did it because he's Mexican and Mexican men take whatever they want.' " *Id.*, at 109. According to the jurors, H.C. further explained that, in his experience, "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." *Id.*, at 110. Finally, the jurors recounted that Juror H.C. said that he did not find petitioner's alibi witness credible because, among other things, the witness was an illegal.' " *Ibid.* (In fact, the witness testified during trial that he was a legal resident of the United States.)

After reviewing the affidavits, the trial court acknowledged H.C.'s apparent bias. But the court denied petitioner's motion for a new trial, noting that "[t]he actual deliberations that occur among the jurors are protected from inquiry under [Colorado Rule of Evidence] 606(b)." *Id.*, at 90. Like its federal counterpart, Colorado's Rule 606(b) generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict. See Fed. Rule Evid. 606(b).

After much discussion of the purpose behind the "no impeachment rule," the Supreme Court found that such a rule must give way when a juror makes a clear statement that he or she relied upon racial stereotypes or animus to convict a defendant:

> For the reasons explained above, the Court now holds that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

*Id.* at 869.

We find that *Peña-Rodriguez* does not warrant reconsideration of the juror issue in the present case. First, as previously discussed, this court did not rely upon the "jury shield law" or "no impeachment rule" in upholding the trial court's decision to quash Relator's subpoena of Juror No. 46 and other relevant jurors. Moreover, even if this court had relied upon such rule, the juror in the present case did not make any statement indicating that she relied upon racial stereotypes or animus to convict Relator. During deliberations, Juror No. 46 revealed only that she had been the victim of a sexual assault. Not only is this revelation devoid of any racial content, this court also found Juror No. 46 did not lie in failing to reveal this information during voir dire. Thus, the trial court's denial of this claim as repetitive was not in error.

## CONCLUSION

Relator seeks review of the trial court's February 15, 2018 ruling dismissing Relator's Uniform Application for Post-Conviction Relief. While Relator's counsel failed to object to the trial court's partial closure of the courtroom during certain portions of trial, the burden is on Relator to show either a reasonable probability of a different outcome in his trial but for counsel's failure to object or that the particular

19

violation was so serious as to render his trial fundamentally unfair. *Weaver v. Massachusetts*, _ U.S. _, 137 S.Ct. 1899 (2017). We find that Relator has failed to meet his burden of proof of ineffective assistance of counsel. Finally, the Supreme Court's holding in *Peña-Rodriguez v. Colorado*, _ U.S. _, 137 S.Ct. 855 (2017), does not warrant reconsideration of Relator's claim regarding Juror No. 46 as Juror No. 46 made no statement that she relied upon racial stereotypes or animus to convict Relator. Thus, the trial court did not err in dismissing that claim as repetitive. Accordingly, Relator's writ application is denied.

**WRIT DENIED.**